UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HASSAN AMHIRRA, | CASE NO. 2:25-cv-01376-TL |
| Petitioner, | |
| v. | ORDER ON WRIT OF HABEAS CORPUS |
| WARDEN, Northwest Detention Center, et al. | |
| Respondents. | |

This matter is before the Court on Petitioner Hassan Amhirra's Petition for Writ of Habeas Corpus (Dkt. No. 1), Petitioner's Motion for Preliminary Injunction (Dkt. No. 14), and the Interested Non-Party United States' Motion to Dismiss (Dkt. No. 16). Having reviewed the petition and motions, the subsequent briefing, and the relevant record, the Court GRANTS Petitioner's petition, DENIES AS MOOT Petitioner's motion, and DENIES the United States' motion.

## I.    BACKGROUND

This case is one of two that Petitioner has filed regarding his detention and removal. The instant case, No. C25-1376 ("*Warden*"), seeks habeas relief and challenges Petitioner's ongoing

detention. The other case, *Amhirra v. Fitting*, No. C25-5800 ("*Fitting*"), is a civil action that

challenges the Government's ongoing efforts to prosecute removal proceedings against Petitioner

without providing Petitioner with a competent interpreter, in violation of Petitioner's due-process

rights. *See generally* Complaint, *Amhirra v. Fitting*, No. C25-5800 (W.D. Wash. Sept. 8, 2025),

Dkt. No. 1.

Petitioner Hassan Amhirra is a native and citizen of Morocco. Dkt. No 1 ¶ 1. Petitioner

"has limited or no proficiency in languages commonly used by DHS [Department of Homeland

Security] (such as English, French, or Arabic)." *Id.* ¶ 47. Petitioner's "primary language is

Tamazight (an Amazigh/Berber language)."[1] *Id.* Petitioner avers that "[h]e fled his home country

due to fear of persecution and arrived in the United States in 2024 seeking protection." *Id.* ¶ 47.

Upon entering United States territory, U.S. authorities apprehended Petitioner. *Id.* Petitioner is

presently located at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington,

where he has been detained since September 15, 2024. *Id.* Respondent is captioned as "Warden,

Northwest Detention Center." Dkt. No. 1 at 1. The United States, which has participated in this

case as an interested non-party, advises that "The Northwest ICE [Immigration and Customs

Enforcement] Processing Centers' [*sic*] Facility Administrator is employed by a private

contractor, the Geo Group. Undersigned counsel does not represent the Respondent. The Petition

does not name a federal entity." Dkt. No. 16 at 1 n.1.[2]

---

[1] Tamazight includes 15 different dialects which, the Parties have demonstrated, are not mutually comprehensible. *See* Dkt. No. 25 ¶ 2.

[2] Although the U.S. Attorney's Office states that it does not represent the NWIPC warden, and the warden has not appeared or otherwise participated in this case, the Court finds that it is still appropriate to proceed and adjudicate the merits of the petition here, because: (1) the purpose of naming the custodian in a habeas petition is to effectuate injunctive relief where appropriate, *see Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (the custodian has "the power to produce the body of [the petitioner] before the court or judge," such that "he may be liberated if no sufficient reason is shown to the contrary" (citation modified)); and (2) the federal government often represents the warden's interests, as it does in this case, *see Doe v. Garland*, 109 F.4th 1188, 1196 (9th Cir. 2024) ("Even in cases where

When Petitioner arrived in the United States, he "expressed a fear of return to Morocco." *Id.* ¶ 49. He was subsequently "placed in the custody of DHS/ICE pending removal proceedings." *Id.* ¶ 50. Initially, Petitioner's removal proceedings were expedited, and Petitioner was scheduled for a credible-fear interview as part of the asylum-screening process. *Id.* ¶ 51. The credible-fear interview never occurred, however, because DHS could not obtain a Tamazight-speaking interpreter. *Id.* ¶ 52. Due to DHS's inability to retain a competent interpreter, Petitioner's removal process has been "brought . . . to a standstill." *Id.* ¶ 54.

On December 13, 2024, an Immigration Judge ("IJ") convened a master calendar hearing in Petitioner's case. *Id.* ¶ 60. No interpreter was present, and the IJ issued an order that terminated the removal proceedings. *Id.* ¶ 62. After the termination of removal proceedings, Petitioner remained detained at NWIPC. *Id.* ¶¶ 75, 77. In July 2025, after approximately ten months of detention, Petitioner requested a bond hearing. *Id.* ¶ 83. On July 16, 2025, an IJ denied the request, ruling that she lacked jurisdiction to consider bond because Petitioner was not in active removal hearings. *Id.* ¶¶ 86–87.

On July 22, 2025, Petitioner filed the instant petition. Dkt. No. 1. That same day, Petitioner filed a motion for a temporary restraining order ("TRO") and preliminary injunction, seeking Petitioner's immediate release from ICE custody and an injunction against Petitioner's continued unlawful detention. Dkt. No. 2. In the alternative, Petitioner's motion asked the Court to order Respondent to provide Petitioner with an expedited bond hearing. *Id.* at 5. On July 23, 2025, the Court denied Petitioner's motion. Dkt. No. 9. In denying the motion, however, the Court "advise[d] Petitioner that he may still seek a preliminary injunction that allows for full

---

private contract wardens are named as respondents, the government can and has stepped in to defend its interest in keeping petitioners detained.").

1   briefing or, if appropriate, pursue alternative paths for relief." *Id.* at 7. Petitioner did just that, and

2   two parallel tracks of motion practice emerged: a habeas track and an injunctive-relief track.

3          On the habeas track, on August 27, 2025, the United States, participating in this case as

4   an interested non-party (*see* Dkt. No. 16 at 1 n.1), filed a return/motion to dismiss the habeas

5   petition. Dkt. No. 16. Petitioner did not file a traverse, and on November 10, 2025, the Parties

6   submitted a joint status report in *Fitting* that advised the Court "the Habeas Petition [in *Warden*]

7   is fully briefed and ripe for decision." Joint Status Report at 1, *Fitting* (Nov. 10, 2025), Dkt.

8   No. 20 at 1.

9          On the injunctive-relief track, on August 20, 2025, Petitioner filed a motion for

10  preliminary injunction. Dkt. No. 14. The motion is substantially similar to the motion for a TRO

11  and seeks the same relief. *Compare* Dkt. No. 14, *with* Dkt. No. 2; *compare* Dkt. No. 14-4

12  (proposed order), *with* Dkt. No. 2-1 (proposed order). On September 10, 2025, the United States

13  filed an opposition to Petitioner's motion. Dkt. No. 22. On September 17, 2025, Petitioner filed

14  his reply brief. Dkt. No. 30.

15         As this case has proceeded, the Government has made multiple unsuccessful attempts to

16  obtain an interpreter and initiate removal proceedings for Petitioner. On or about July 17, 2025,

17  the Government initiated a new removal case against Petitioner. Complaint ¶ 37, *Fitting* (Sept. 8,

18  2025), Dkt. No. 1.

19         On July 31, 2025, the Government attempted to hold a master calendar hearing for

20  Petitioner. *Id.* ¶ 45. No interpreter was present, and the IJ "was unable to communicate with

21  [Petitioner] to either explain the proceedings, take pleadings, or conduct any substantive

22  business." *Id.* ¶¶ 46–47. The IJ continued the hearing. *Id.* ¶ 48.

23         On August 18, 2025, "the exact same scenario played out . . . ." *Id.* ¶ 51.

24

On September 2, 2025, the Government tried again. *Id.* ¶ 56. Again, there was no interpreter. *Id.* ¶ 57.

In the present case, Petitioner filed a second status report providing that on September 12, 2025, the Government attempted a master calendar hearing and, this time, "attempted to proceed with a Tamazight interpreter." Dkt. No. 25 (Petitioner's Second Status Report) ¶ 1–2. The interpreter and Petitioner "ha[d] difficulty understanding each other's dialects" because "there are 15 different Tamazight dialects," *Id.* ¶ 2. As a result, the matter was again continued. *Id.* ¶ 3.

On October 28, 2025, the Government convened another hearing. *See* Dkt. No. 42 (United States' Status Report) at 1. "While the interpreter could understand Petitioner's dialect, Petitioner could not understand the interpreter's dialect." *Id.* The IJ reset the hearing to November 26, 2025, so that an appropriate interpreter could be provided. *Id.*

On November 26, 2025, the Government held another hearing, but the problem persisted: "While the interpreter could understand Petitioner, Petitioner could not understand the interpreter." Dkt. No. 46 (United States' Status Report) at 1. The United States advised the Court that, after this unsuccessful hearing, the IJ "reset the hearing to be held within the next two weeks." *Id.* at 2. The United States asserted that "[i]f an appropriate interpreter cannot be located, the immigration judge stated that he will terminate the case without prejudice." *Id.*

On December 15, 2025, the Government held another hearing. *See* Dkt. No. 51 (United States' Status Report) at 1. No competent interpreter was present. *Id.* This hearing was not before the same IJ as the prior hearing. *See* Dkt. No. 52-2 (audio recording). Instead of terminating the case, however, the IJ re-set the hearing to January 29, 2025, "so that an appropriate interpreter could be provided." Dkt. No. 51 at 1. In re-setting the case, the IJ opined that the immigration court "may have" a suitable interpreter at the next hearing—"hopefully, after making every effort." Dkt. No. 52-1.

On December 19, 2025, Petitioner filed a status report, noting that "[a]fter the 10th hearing to locate a qualified interpreter, the Petitioner's removal proceedings were rescheduled once again to locate a qualified interpreter." Dkt. No. 54 at 2. Petitioner avers that, through counsel, he has advised the immigration court "of the exact interpretation services required," but that that court has "demonstrate[d] a clear lack of diligence in securing a qualified interpreter." *Id.* Indeed, Petitioner asserts that at his November 26, 2025, hearing, the immigration court provided Petitioner with the same interpreter it had provided at a prior hearing, despite that interpreter's previously demonstrated unsuitability. *See id.* Petitioner asserts, "At no point has there been any indication that the [immigration court] either understands the Petitioner's language needs, is effectively attempting to secure [an interpreter,] or is even capable of securing an appropriate interpreter." *Id.* at 4. Petitioner requested the prompt adjudication of his petition for writ of habeas corpus. *See id.*

## II.    STATUTORY FRAMEWORK AND CASELAW OVERVIEW

Petitioner is detained pursuant to 8 U.S.C. § 1225(b). Dkt. No. 16 at 5. Noncitizens are considered "applicants for admission" to the United States when they have not been admitted or arrive in the United States. 8 U.S.C. § 1225(a)(1). "Applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *See Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). Section 1225(b)(1) applies to noncitizens who are "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." *Id*. (citing § 1225(b)(1)(A)(i)). The *Jennings* Court found that Section 1225(b)(2) is broader and "serves as the catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Id*.

Typically, noncitizens who fall under Section 1225(b)(1) are "subject to an expedited removal process that does not include a hearing before an [immigration judge] or review of the

removal order," but when a noncitizen indicates an intention to apply for asylum, or fear of

prosecution, they must be referred for an interview with an asylum officer. *Banda v. McAleenan*,

385 F. Supp. 3d 1099, 1111–12 (W.D. Wash. 2019) (quoting 8 U.S.C. §1225(b)(1)(A)(ii); 8

C.F.R. § 208.30(d)). If, after the interview with an asylum officer, the officer determines

noncitizen's fear is credible, the noncitizen "shall be detained for further consideration of the

application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii); *Banda*, 385 F. Supp. 3d at 1112. In sum,

both §§ 1225(b)(1) and (b)(2) mandate detention of noncitizens for the entirety of the applicable

proceedings. *Jennings*, 583 U.S. at 302.

While the detention of noncitizens may be mandated under Section 1225(b), both the

Supreme Court as well as the Ninth Circuit have "grappled . . . with whether the various

immigration detention statutes may authorize indefinite or prolonged detention of detainees and,

if so, may do so without providing a bond hearing." *Rodriguez v. Robbins*, 804 F.3d 1060, 1067

(9th Cir. 2015)[3], *rev'd sub nom. Jennings v. Rodriguez*, 583 U.S. 281 (2018) (citation modified).

The Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001), held that the Immigration

Nationality Act ("INA") does not authorize "indefinite, perhaps permanent, detention," *id.* at

699, of noncitizens subject to final orders of removal under Section 1231(a)(6), instead

construing the statute to contain an "implicit 'reasonable time' limitation," *id.* at 682. "[F]or the

sake of uniform administration in the federal courts," the Supreme Court recognized six months

as that time limitation. *Id.* at 701. It further found that if a statute were to permit indefinite

detention of a noncitizen, that would "raise a serious constitutional problem." *Id.* at 690.

"Freedom from imprisonment—from government custody, detention, or other forms of physical

---

[3] This case stems from a class action, in which numerous issues within the claims brought by the petitioners were appealed to the Ninth Circuit. For clarity purposes, the Court will cite these cases throughout the order using a full citation, except when using "id." to refer to an immediately preceding citation.

1    restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause

2    protects." *Id*.

3        Two years later, in *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court considered a

4    due process challenge to Section 1226(c), which mandates detention during removal proceedings

5    for noncitizens convicted of certain crimes. In holding that the Government could

6    constitutionally detain deportable noncitizens during the limited period necessary for their

7    removal proceedings, the Supreme Court stressed the "brief" nature of mandatory detention

8    under that section which, in the vast majority of cases, was less than about five months. *Id.* at

9    518–21, 526, 529–30. Justice Kennedy, in his concurring opinion that provided the fifth vote to

10   create the majority, reasoned that a noncitizen could be entitled to "an individualized

11   determination as to his risk of flight and dangerousness if the continued detention became

12   unreasonable or unjustified" under the Due Process Clause. *Id.* at 532 (Kennedy, J., concurring)

13   (citation omitted).

14       Post *Zadvydas* and *Demore,* the Ninth Circuit held that the detention under § 1226(c) of a

15   lawfully admitted resident noncitizen subject to removal for over 32 months was

16   "constitutionally doubtful." *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005). In 2013, the

17   Ninth Circuit concluded that "[b]ecause *Demore's* holding hinged on the brevity of mandatory

18   detention . . . 'prolonged detention of aliens is permissible only where the Attorney General finds

19   such detention individually necessary by providing the alien with an adequate opportunity to

20   contest the necessity of his detention.'" *Rodriguez v. Robbins*, 715 F.3d 1127, 1135 (9th Cir.

21   2013). Therefore, "under § 1226(a)'s discretionary detention regime, a bond hearing is required

22   before the government may detain an alien for a 'prolonged' period." *Id.*

23       In 2018 in *Jennings*, the Supreme Court held that Section 1225(b) of the INA—under

24   which Petitioner is detained—"unambiguously authorizes detention pending resolution of

1    removal proceedings and does not plausibly suggest a 6-month limitation or periodic bond

2    hearings." *Banda*, 385 F. Supp. 3d at 1115 (W.D. Wash. 2019) (citing *Jennings*, 583 U.S. at 297,

3    303). While *Jennings* declined to address whether the Constitution places limits on prolonged

4    detention under the INA, 583 U.S. at 312, the Ninth Circuit post-*Jennings* expressed "grave

5    doubts that any statute that allows for arbitrary prolonged detention without any process is

6    constitutional or that those who founded our democracy precisely to protect against the

7    government's arbitrary deprivation of liberty would have thought so." *Rodriguez v. Marin*, 909

8    F.3d 252, 256 (9th Cir. 2018).

9                            **III.    LEGAL STANDARD**

10       Neither the Supreme Court nor the Ninth Circuit has settled on a test for assessing the

11   constitutionality of prolonged mandatory detention. *See Banda,* 385 F. Supp. 3d at 1106.

12   However, "'[n]early all district courts that have considered the issue agree that prolonged

13   mandatory detention pending removal proceedings, without a bond hearing, will—at some

14   point—violate the right to due process.'" *Maliwat v. Scott*, No. C25-788, 2025 WL 2256711, at

15   *3 (W.D. Wash. Aug. 7, 2025) (quoting *Banda*, 385 F. Supp. 3d at 1116); *see also Rogers v.*

16   *Ripa*, No. C21-24433, 2022 WL 708493, at *4–5 (S.D. Fla. Jan. 22, 2022), *report and*

17   *recommendation adopted*, 2022 WL 574389 (Feb. 25, 2022); *Romero Romero v. Wolf*, No. C20-

18   8031, 2021 WL 254435, at *3 (N.D. Cal. Jan. 26, 2021); *Leke v. Hott*, 521 F. Supp. 3d 597, 604–

19   05 (E.D. Va. 2021); *Martinez v. Clark*, No. C18-1669, 2019 WL 5968089, at *6 (W.D. Wash.

20   May 23, 2019); *Thompson v. Horton*, No. C19-120, 2019 WL 4793170, at *5 n.7 (N.D. Ala.

21   Aug. 26, 2019).

22       In assessing the constitutionality of prolonged mandatory detention, the court in *Banda*

23   declined to apply the test in *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976), because the test

24   does "not resolve the more fundamental issue of whether any procedure—such as a bond

hearing—must be provided." *Banda*, 385 F. Supp. 3d at 1106–07. Rather, the Court in *Banda*

conducted a case-specific analysis considering the following factors:

> (1) the total length of detention to date; (2) the likely duration of
> future detention; (3) the conditions of detention; (4) delays in the
> removal proceedings caused by the detainee; (5) delays in the
> removal proceedings caused by the government; and (6) the
> likelihood that the removal proceedings will result in a final order
> of removal."

*Id*. at 1117 (quoting *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858–59 (D. Minn. 2019)).

Courts in this district have now adopted the "*Banda* test" to assess when detention violates due

process. *See, e.g.*, *Maliwat*, 2025 WL 2256711, at *3–4; Report and Recommendation, *Belqasim

v. Hermosillo*, No. C25-1282, (W.D. Wash. Oct. 28, 2025), Dkt. No. 17, *report and

recommendation adopted*, 2025 WL 3170929 (Nov. 13, 2025); *Hong v. Mayorkas*, No. C20-

01784, 2022 WL 1078627, at *4–5 (W.D. Wash. Apr. 11, 2022). The Respondents acknowledge

that courts in this District analyze this issue using the *Banda* multi-factor test, and the Court will

likewise apply the *Banda* test in determining if Respondents have met their burden of proving

that Petitioner's continued detention without a bond hearing is justified.

## IV.    DISCUSSION

**A.    The *Banda* Factors**

### 1.    Total Length of Detention

"[T]he most important factor" under the *Banda* test is the length of detention. *Banda*, 385

F. Supp. 3d at 1118. The "context" of a petitioner's circumstances is crucial to keep in mind,

particularly that "[t]he detention that is being examined here is the detention of a human being

who has never been found to pose a danger to the community or to be likely to flee if released."

*Jamal A.*, 358 F. Supp. 3d at 859. "The longer mandatory detention continues . . . the harder it is

to justify." *Murillo-Chavez v. Garland*, No. C22-303, 2022 WL 16555994, at *5 (W.D. Wash. Aug. 30, 2022), *report and recommendation adopted*, 2022 WL 16553176 (Oct. 31, 2022).

As of the date of this Order, Petitioner has been detained for approximately 15 months. *See* Dkt. No. 1 ¶ 47. Courts in this district have found that similar detention lengths weigh in favor of granting a bond hearing. *See, e.g.*, *Banda*, 385 F. Supp. 3d at 1118–19 (finding that petitioner's length of detention "strongly favors" a bond hearing because "Petitioner has been in detention for approximately 17 months, which is a very long time."); *Toktosunov v. Wamsley*, No. C25-1724, 2025 WL 3492858, at *4 (finding petitioner's 16-month detention favored granting a bond hearing); *Cardozo v. Bostock*, No. C25-871, 2025 WL 2592275, at *1 (W.D. Wash. Sept. 8, 2025) (12 to 13 months)); *Maliwat*, 2025 WL 2256711, at *2 ("nearly" 12 months); *Rahman v. Garland*, No. C24-2132, 2025 WL 1920341, at *3 (W.D. Wash. June 26, 2025), *report and recommendation adopted sub nom. Anisur R. v. Garland*, 2025 WL 1919252 (July 11, 2025) ("almost" 12 months); *Ashemuke v. ICE Field Off. Dir.*, No. C23-1592, 2024 WL 1683797, at *4 (W.D. Wash. Feb. 29, 2024), *report and recommendation adopted*, 2024 WL 1676681 (Apr. 18, 2024) (11 months).

Therefore, the Court finds that the first *Banda* factor weighs in favor of granting a bond hearing.

### 2.    Likely Duration of Future Detention

The second *Banda* factor is the likely duration of future detention. *Banda*, 385 F. Supp. 3d at 1118. The United States asserts that this factor "cannot be assessed at this time." Dkt. No. 16 at 7. The United States advised in August 2025 that "[t]he immigration court is working to obtain an appropriate interpreter to move forward with his removal proceedings." *Id.*

If anything, this factor weighs slightly in favor of granting a bond hearing. In *Maliwat*, the court found the third *Banda* factor neutral after "declin[ing] to speculate as to the likely

duration of future detention." *Maliwat*, 2025 WL 2256711, at *5. The court noted that "[w]here proceedings are in much earlier stages"—i.e., pre-appeal—"courts have found the factor neutral." *Id.* (collecting cases). Here, under ordinary circumstances, the Court would tend to find the factor neutral, too, "[g]iven that [Petitioner's] case is still before the IJ, and no appeal has been filed." *Id.* But the Government's serial failures to obtain an interpreter, combined with: (1) its repeated representations that it will do so; and (2) the immigration court's unexplained about-face regarding its intent to terminate Petitioner's case, render these circumstances decidedly extraordinary. The Court is unimpressed with the IJ's assurance that, "hopefully, after making every effort," the immigration court will be able to provide an interpreter—in six weeks' time. The IJ's language amounts to a wing and a prayer and, what is more, it is unclear why this next pause must last through the end of January 2026. The seemingly arbitrary durations of the immigration court's continuances and re-sets, *see supra* Section I, do not demonstrate that court's appreciation that what is at issue here is "the detention of a human being who has never been found to pose a danger to the community or to be likely to flee if released." *Jamal A.*, 358 F. Supp. 3d at 859. Put another way, the record tends to indicate that the immigration court is content to play it fast and loose with Petitioner's right to due process and to proceed in an ad hoc manner for as long as it takes to remove Petitioner. The Court cannot abide such a scenario.

Therefore, the Court finds that the second *Banda* factor weighs in favor of granting a bond hearing.

### 3.    The Conditions of Detention

The third *Banda* factor is the conditions of detention. *Banda*, 385 F. Supp. 3d at 1118. The United States asserts only that Petitioner "is detained at the NWIPC." Dkt. No. 16 at 7. For his part, Petitioner characterizes his detention as "prison-like." Dkt. No. 1 ¶ 109. "Courts in this

District have . . . found that, at this facility, under circumstances similar to that of Petitioner, this factor favors granting a bond hearing." *Toktosunov*, 2025 WL 3492858, at *5 (collecting cases).

Given the United States' failure to rebut Petitioner's comparison of the NWIPC to prison, the Court finds that the third *Banda* factor weighs in favor of granting a bond hearing.

### 4.    Delays in Removal Proceedings Caused by Petitioner

The fourth *Banda* factor considers delays in the removal proceedings caused by the petitioner. *Banda*, 385 F. Supp. 3d at 1118. The United States concedes that "[t]here are no indicia at this time that [Petitioner] has caused delay in his removal proceedings." Dkt. No. 22 at 4.

Therefore, the Court finds that the fourth *Banda* factor weighs in favor of granting a bond hearing.

### 5.    Delays in Removal Proceedings Caused by Respondent

The fifth *Banda* factor considers delays in the removal proceedings caused by Respondent. *Banda*, 385 F. Supp. 3d at 1118. The United States urges the Court not to find "that the Government's efforts to obtain the appropriate interpreter for [Petitioner] are averse to the Government for this factor." Dkt. No. 22 at 5. But in the original examination of the fifth *Banda* factor, the *Banda* court itself attributed "essentially all the delay" in that case to "*the lack of an appropriate interpreter* or DHS's request for a continuance." *Banda*, 385 F. Supp. 3d at 1120 (emphasis added). In *Banda*, DHS sought to avoid responsibility for the delay by "plac[ing] the blame for the difficulties securing an interpreter on the Executive Office for Immigration Review, which is the agency responsible for arranging interpretation services for immigration court hearings." *Id.* The court rejected this position, finding that "regardless of which agency caused the delay, it is attributable to the Government, not petitioner." *Id.* (citing *Sajous v. Decker*, No. C18-2447, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018)); *see also Belqasim*,

2025 WL 3466971, at *9 (finding delay caused by failure to find an interpreter attributable to the government). Similarly here, the Court will not leave the Government unaccountable for its inability to retain a competent interpreter.

The Court has been patient with Respondent and has delayed adjudication of Petitioner's petition based on the United States' serial representations regarding the retention of a competent interpreter. *See, e.g.*, Dkt. No. 18 (Carbajal Decl.) ¶ 4 (asserting that Petitioner's "case was reset to August 18, 2025, to schedule an interpreter in the appropriate language"); Dkt. No. 17 (Sica Decl.) ¶ 23 (asserting that Petitioner's hearing was "reset . . . to September 2, 2025, to find another interpreter"); Dkt. No. 26 (United States' Status Report) at 1 (advising the Court on September 17, 2025, that the "[immigration] court will continue to locate an interpreter in [Petitioner's] dialect"); Dkt. No. 42 (United States' Status Report) at 1 (advising the Court on November 4, 2025, that Petitioner's hearing had been reset to November 26, 2025, "so that an appropriate interpreter could be provided"); Dkt. No. 46 (United States' Status Report) at 2 (advising the Court on December 1, 2025, that Petitioner's hearing had been reset "to be held within the next two weeks," and that "[i]f an appropriate interpreter cannot be located, the immigration judge stated that he will terminate the case without prejudice"); Dkt. No. 51 (United States' Status Report) at 1 (advising the Court on December 16, 2025, that Petitioner's hearing had been reset "to January 29, 202[6], so that an appropriate interpreter could be provided"); *see also* Dkt. No. 20 (Order on Briefing Schedule) at 2 (declining to "accelerate the briefing schedule" because "Petitioner will appear in immigration court on September 2, 2025," where, "[o]stensibly an adequate interpreter will be provided"); Dkt. No. 32 (Order on Status Report) at 2–3 (re-noting Petitioner's motion for preliminary injunction and advising the Parties that "if an adequate interpreter is not sourced for the October 28 hearing, the motions will not be re-noted again in anticipation of another hearing absent a specific showing that an interpreter capable of

communicating with Petitioner has been afforded"); Dkt. No. 45 (Order) (directing the Parties to submit status reports); Dkt. No. 50 (Order) (directing United States to submit status report). After so many false starts and failed attempts, the Court's patience has run out.

Therefore, the Court finds that the fifth *Banda* factor weighs in favor of granting a bond hearing.

### 6.    Likelihood That Removal Proceedings Will Result in a Final Order of Removal

The sixth *Banda* factor considers the likelihood that removal proceedings will result in a final order of removal. *Banda*, 385 F. Supp. 3d at 1118. The United States asserts that "[i]t is too early to assess this factor." Dkt. No. 22 at 5. Petitioner asserts that the interpreter issue points away from an ultimate result of removability. *See* Dkt. No. 14 at 17. Petitioner's argument here is misplaced because, as Petitioner argues in his habeas petition itself, the interpreter issue is a threshold matter that must be resolved before removal proceedings can even commence. Put another way, without an interpreter, there are no removal proceedings. Therefore, the interpreter issue has no bearing on the ultimate outcome of Petitioner's yet-unrealized removal proceedings. Absent any consideration of the merits, then, the Court agrees with the United States that it is too early to assess this factor. Therefore, the Court finds that the sixth *Banda* factor is neutral.

*        *        *

In sum, five of the six *Banda* factors weigh in favor of granting Petitioner a bond hearing, none weighs in favor of Respondent, and one is neutral. The Court thus finds that Petitioner's detention has become unreasonable, "and that due process requires the Government to provide him with a bond hearing." *Banda*, 385 F. Supp. 3d at 1120; *see Toktosunov*, 2025 WL 3492858, at *6 (collecting cases).

**B.     Appropriate Relief**

Having found that Petitioner's detention has become unreasonable, the Court will now address his various requests for relief. Petitioner's prayer for relief includes six parts: First, Petitioner seeks his immediate release from custody. Dkt. No. 1 at 20. Second, in the alternative to immediate release, Petitioner seeks to have an individualized bond hearing before an immigration judge within 14 days. *Id.* At the hearing, "the government should bear the burden of proving by clear and convincing evidence that Petitioner's continued detention is justified (i.e., that he poses a flight risk or danger that cannot be mitigated). If the government cannot meet that burden, Petitioner should be released on appropriate terms." *Id.* at 20–21. Third, Petitioner seeks to have the Court declare that his continued detention is unlawful and unconstitutional. *Id.* at 21. Fourth, Petitioner seeks to enjoin Respondent from continuing to detain Petitioner in violation of the law. *Id.* Fifth, Petitioner seeks reasonable attorney fees and costs. *Id.* Sixth, Petitioner seeks other relief that the Court deems "proper in the interests of justice." *Id.*

**1.     Release or Bond Hearing**

"Courts in this district have refused to order immediate release, finding that '[t]here is no authority' to support a claim that a petitioner 'is entitled to an order of release.'" *Maliwat*, 2025 WL 2256711, at *9 (quoting *Juarez v. Wolf*, No. C20-1660, 2021 WL 2323436, at *8 (W.D. Wash. May 5, 2021), *report and recommendation adopted*, 2021 WL 2322823 (June 7, 2021)) (collecting cases). Therefore, the Court declines to order Petitioner's immediate release.

**2.     Bond Hearing**

Petitioner's alternative request for relief is for the Court to order "a prompt individualized bond hearing before an immigration judge . . . within 14 days of the Court's order." Dkt. No. 1 at 20. Where courts in this District have considered meritorious habeas petitions from asylum-seekers who, like Petitioner, have been unreasonably detained under 8 U.S.C. § 1225(b), they

have generally ordered the Government to provide the successful petitioner with a bond hearing. *See, e.g.*, *Banda*, 358 F. Supp. 3d at 1120; *Maliwat*, 2025 WL 2256711, at *10; *Toktosunov*, 2025 WL 3492858, at *6. This case presents no basis for deviation. As to the timing of the hearing, Petitioner requests that the hearing be scheduled within 14 days of this Order. Dkt. No. 1 at 20. Although a 14-day timeline would be "[c]onsistent with the practice of this District," *Toktosunov*, 2025 WL 3492858, at *6 (collecting cases), the Court will allow 21 days here, given the scheduling complications presented by the holiday season and in recognition of the Government's ongoing struggle to locate a competent interpreter for Petitioner.

"At a civil detention hearing, the Government must prove by clear and convincing evidence that the detainee is a risk of flight." *Toktosunov*, 2025 WL 3492858, at *6 (citing *Singh v. Holder*, 638 F.3d 1196, 1204 (9th Cir. 2011), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018)); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) (holding that "the constitutionally grounded hearing requirements set forth in *Singh* are also applicable [to bond hearings for those detained under § 1225(b)]"); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1199 (9th Cir. 2022) (explaining that the clear-and-convincing burden in *Singh* was based on general principles of due process); *Banda*, 385 F. Supp. 3d at 1120. There must be a contemporaneous record of the bond hearing. *See Rodriguez*, 715 F.3d at 1136. Moreover, "[w]hen an immigration court determines that a noncitizen is not 'a danger to the community and not to be so great a flight risk as to require detention without bond,' due process requires a consideration of the noncitizen's financial circumstances regarding ability to afford bail, as well as alternative conditions of release." *Toktosunov*, 2025 WL 3492858, at *6 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 1000 (9th Cir. 2017)). "A bond determination process that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate

interests." *Hernandez v. Sessions*, 872 F.3d at 991; *see also Abduraimov v. Andrews*, No. C25-843, 2025 WL 2912307, at *10 (E.D. Cal. Oct. 14, 2025); *Cantor v. Freden*, 761 F. Supp. 3d 630, 640 (W.D.N.Y. 2025).

The Court is unaware of any authority that permits the Government to relax Constitutional due process requirements on the grounds that it finds it difficult to comply with them. That is to say, the Government's inability to hold a hearing does not obviate the due process violation inherent to Petitioner's continued detention. *See Cardozo*, 2025 WL 2592275, at *3 (ordering Petitioner released unless government provides petitioner with individualized bond hearing within 14 days); *Vargas v. Wolf*, No. C19-2135, 2020 WL 1929842, at *11 (D. Nev. Apr. 21, 2020) (ordering petitioner "released on appropriate conditions" if government is unable to prove by clear and convincing evidence that petitioner is a flight risk or danger to community). Therefore, in the event that the Government is unable to provide Petitioner with an individualized bond hearing before the deadline imposed by this Order, the Government must release Petitioner from custody, "under appropriate conditions of release." *Belqasim*, 2025 WL 3466971, at *13. "Because DHS will monitor these conditions, this Court thinks it best to allow DHS to impose those that it determines are necessary." *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 243 n.13 (W.D.N.Y. 2019).

### 3.    Declaration

Courts in this District and other districts have found that prolonged detention violates due process. The *Banda* factors are used to "determine when detention has become unconstitutionally prolonged," and "if a detainee is entitled to a bond hearing under *Banda*, it is because his continued detention without one—as the text of Section 1225(b) allows—violates due process." *Cardozo*, 2025 WL 2592275, at *2. For the reasons stated in Section IV.A, Petitioner's detention has become prolonged. "When a court issues a writ of habeas corpus, it declares in essence that

the petitioner is being held in custody in violation of his constitutional (or other federal) rights." *Harvest v. Castro*, 531 F.3d 737, 741 (9th Cir. 2008). Therefore, the Court declares that Section 1225(b) is unconstitutional as applied to the facts of this case, and that Petitioner's prolonged detention under Section 1225(b) violates the Due Process Clause of the Fifth Amendment. *See Toktosunov*, 2025 WL 3492858, at *7.

### 4.    Injunction

Having found that Petitioner's ongoing detention is unreasonable, the Court may order injunctive relief to protect Petitioner's due process rights. *See, e.g.*, *Luz Marina V.N. v. Robbins*, No. C25-1845, 2025 WL 3701960, at *5 (E.D. Cal. Dec. 21, 2025) (granting petition for writ of habeas corpus and enjoining and restraining respondents "from re-detaining petitioner unless they demonstrate, by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker, that petitioner is a flight risk or danger to the community such that her physical custody is legally justified"); *Aguilera Barrientos v. Chestnut*, No. C25-1490, 2025 WL 3677319, at *5 (E.D. Cal. Dec. 18, 2025) (same); *Garcia-Donis v. Noem*, No. C25-3281, 2025 WL 3467385, at *1 (S.D. Cal. Dec. 3, 2025) (granting petition for writ of habeas corpus and enjoining respondents from detaining petitioner under 8 U.S.C. § 1225). Therefore, Respondent, his agents, employees, and all persons acting under his direction are control, are enjoined from continuing to detain Petitioner in violation of the law, subject to the 21-day grace period described above in Section IV.B.1.

### 5.    Attorney Fees and Costs

Petitioner may file a fee petition, as set forth in the Equal Access to Justice Act, 28 U.S.C. § 2412.

**C.    Additional Motions**

Also pending before the Court are Petitioner's motion for a preliminary injunction (Dkt. No. 14) and the United States' motion to dismiss (Dkt. No. 16). Given the granting of Petitioner's motion for habeas corpus, Petitioner's motion for a preliminary injunction (Dkt. No. 14) is moot and is therefore DENIED on that basis. *See Soryadvongsa v. Noem*, No. C25-2663, 2025 WL 3126821, at *3 (S.D. Cal. Nov. 8, 2025) (granting habeas petition and denying motion for preliminary injunction as moot); *Flores Marquez v. Knight*, No. C25-2203, 2025 WL 3527244, at *7 (D. Nev. Dec. 9, 2025) (same). The United States' motion to dismiss (Dkt. No. 16) is likewise DENIED.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1

## V.     CONCLUSION

2        Petitioner's petition for writ of habeas corpus (Dkt. No. 1) is GRANTED. It is hereby

3   ORDERED:

4        (1)      The Government SHALL hold a bond hearing for Petitioner **within twenty-one**

5                 **(21) calendar days** of this Order. In the event that bond is granted, Respondent is

6                 ORDERED to immediately release Petitioner.

7        (2)      If the individualized bond hearing is not conducted **by January 13, 2026**,

8                 Petitioner SHALL be immediately released under appropriate conditions of release,

9                 until it is determined that his detention is warranted under the Immigration and

10                Nationality Act and is in accordance with this Order.

11       (3)      Respondent is ENJOINED from continuing to detain Petitioner after January 13,

12                2026, in violation of the law or in contravention of this Order.

13       (4)      Petitioner and the United States SHALL file a status report on the status of

14                Petitioner's bond hearing **no later than January 14, 2026**. The status report

15                SHALL detail if and when the bond hearing occurred, if bond was granted or

16                denied and, if denied, the reasons for that denial.

17       (5)      Petitioner's motion for preliminary injunction (Dkt. No. 14) is DENIED as moot.

18       (6)      The United States' motion to dismiss (Dkt. No. 16) is DENIED.

19
        Dated this 23rd day of December, 2025.

20

21

22                                                          Tana Lin
                                                            United States District Judge
23

24